```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MISSOURI
                    EASTERN DIVISION


UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
     v.                          )    No. 4:04 CR 598 ERW
                                 )                    DDN
CHARLES LADEN,                   )
                                 )
          Defendant.             )
```

**REPORT AND RECOMMENDATION**
<u>**OF UNITED STATES MAGISTRATE JUDGE**</u>

This action is before the Court upon the pretrial motions of the parties, which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on January 4, 2005.

Defendant Charles Laden has moved to suppress evidence and statements (Doc. 12). From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

1. On January 8, 2004, St. Louis Metropolitan Police Detective Roger Murphey was told by a confidential informant[1] (CI) that later that day a black man with the first name "Charles" and a last name that sounded like either "Laden" or "Laten" would be buying a pound of marijuana from a black man nicknamed "Big Dough," whom Det. Murphey knew from a prior police investigation to be Deshawn Stewart. The CI told Murphey that the sale would occur with Big Dough driving a blue Oldsmobile automobile[2] in the 4000 block of Grove in the City of St. Louis, with "Laden" or "Laten" riding in the automobile as a passenger,

---

[1]This confidential informant had proven reliable in the past, because his information led to convictions in state and federal courts.

[2]In May 2003, Det. Murphey arrested Big Dough and knew that he had been convicted in Missouri circuit court. He knew that "Big Dough" drove a 1989 blue Oldsmobile automobile and that he was "documented" to be a member of the 2900 Bailey Street Hustler street gang.

and that "Laden" or "Laten" would have a sawed-off shotgun with him. The CI described "Big Dough" and "Laden" or "Laten" by height, weight, and race.[3] After receiving this information, Det. Murphey verified the description and registration of Big Dough's Oldsmobile.

2. As Det. Murphey and his partner, Det. Timothy Borstell, both of whom were dressed in police uniforms and driving a marked police car, were driving to the 4000 block of Grove, they encountered the CI who told them that Big Dough was then en route to make the transaction. When they arrived in the 4000 block of Grove, at approximately 9:30 p.m., the officers saw Big Dough's blue Oldsmobile being driven away from the curb in front of 4017 Grove. The officers followed the Oldsmobile to the intersection of Bailey and Pleasant where they put on their emergency lights and stopped the car. The Oldsmobile was immediately stopped at the curb; the officers had not seen it driven in violation of any traffic law and they did not have an arrest warrant or a search warrant for the occupants or the vehicle.

3. The officers immediately left the police car and walked to the Oldsmobile, Murphey on the driver's side and Borstell on the passenger's side. As he did so, Det. Murphey saw the front seat passenger, later identified as defendant Charles Laden, lean forward in his seat, place his left hand behind his back, and then lean back. Because of the suspected possession of a sawed-off shotgun by the passenger, Murphey directed driver Deshawn Stewart to get out of the car, which he did. Det. Murphey told passenger Laden to lean forward and place his elbows on the dashboard.

4. As Laden leaned forward and placed his elbows on the dashboard, Det. Murphey saw behind him on the seat a large ziplock plastic bag which contained a large quantity of a green substance, which Murphey believed was marijuana. Det. Murphey told Laden he was under arrest for possession of a controlled substance and Det. Borstell seized the marijuana from the automobile. Stewart was not arrested.

5. Next, Det. Murphey advised Laden of his constitutional rights to counsel and to remain silent, by reading the rights to Laden from a

---

[3]This description of "Big Dough" was identical to the person later stopped by Det. Murphey.

card.  He asked Laden whether he understood his rights and Laden answered in the affirmative.  Murphey then asked Laden whether he would cooperate in the investigation; Laden answered in the affirmative.  Then, the officer asked Laden questions about the marijuana and the suspected firearm.  Laden gave oral statements in answer to the officer's questions.

     6.   At one point, Det. Murphey asked Laden whether the police could search his house; Laden answered in the affirmative.  Murphey then went to his police car and returned with a printed Consent to Search form, Government Exhibit 1 (attached to the government's memorandum, Doc. 13).  The officer filled out the top part of the form by writing in Laden's name, identifying himself and his partner, and writing the place to be searched (4114 N. 22nd Street, first floor).  He then explained the form to Laden.  The form contained the statements,

> I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

Gov. Ex. 1.  Laden signed the form at approximately 9:40 p.m., without being forced to do so, without any threat, and without any promise being made to induce his cooperation; Laden appeared to be competent.  At no time during this discussion did the officers draw any firearm.  By signing the form, Laden expressly gave the police his consent to search his residence.  Id.

     7.   The officers then placed Laden in a police cruiser, which they followed to Laden's residence.  After they arrived, Det. Murphey asked Laden whether there was anyone else there.  Laden said his girlfriend was inside.  Then the officers and Laden entered the residence.  Once inside, Murphey asked Laden where the firearm was.  Laden directed the officer to a particular dresser.  In an open drawer, the officer found and seized a sawed-off shotgun.  Thereafter, Laden was transported to the police station.

     8.   At the police station, Murphey told Laden he would be charged with the unlawful use of a weapon.  The officer again orally advised Laden of his constitutional rights to remain silent and to counsel.

Laden said he understood his rights.  Thereafter, Det. Murphey asked Laden questions and Laden gave oral answers.  Next, Murphey asked Laden whether he would put his statements into writing.  Laden said he would do so.

9.   At that time, Det. Murphey produced a written Warning and Waiver form, Government Exhibit 2 (attached to the government's memorandum, Doc. 13).  Murphey wrote Laden's biographical information on the top portion of the form.  Murphey and Laden then read together the middle section of the form which contained the statements of rights.  Laden initialed each statement of a right, indicating he understood the right.  He also placed his initials next to the printed statement, "I have read and understand all these rights.  I voluntarily waive the rights and desire to make a statement."  In the bottom portion of the form, Laden hand-printed a statement.  After his written statement and printed acknowledgment that the statement is true and made without coercion, Laden signed his name.  Gov. Ex. 2.  No promise, threat, or other coercion was used to induce Laden to cooperate and to make these statements.

## DISCUSSION

**A.   Terry Stop**

The vehicle stop and subsequent arrest for possession of a controlled substance was lawful and should not be suppressed.  Police do not violate the Fourth Amendment by stopping a motor vehicle when they have reasonable suspicion, based on specific and articulable facts, that a driver or passenger is involved in criminal activity.  Terry v. Ohio, 392 U.S. 1, 25-31 (1968); United States v. Robinson, 119 F.3d, 663, 666 (8th Cir. 1997) (quoting United States v. Sokolow, 490 U.S. 1, 7-8, 109 (1989) ("The level of suspicion required to justify a stop is, however, 'considerably less than proof of wrongdoing by a preponderance of the evidence' and must be evaluated under 'the totality of the circumstances.'")); Robinson, 119 F.3d at 666-67 ("An officer may rely on information provided by other officers and all of the information known to the team of officers involved in the investigation to provide justification for a stop.").

In the instant case, Dets. Murphy and Borstell had reasonable suspicion, based on specific articulable facts from both the CI and their observations, that defendant and the vehicle in question were involved in a narcotics sale. The CI was both known to the officers and had proven reliable in the past; leading to convictions in both state and federal court. The CI provided the officers with specific information including the name and physical descriptions of the participants in the narcotics sale, the vehicle to be used in the transaction, and the location of said sale. U.S. v. Spotts, 275 F.3d 714, 720 (8th Cir. 2002) ("A tip from a known informant can suffice by itself to establish reasonable suspicion for a vehicle stop, even if the police do not corroborate the tip prior to the stop with their own independent observation.").

The CI's information is further corroborated by the knowledge and observations of Dets. Murphey and Borstell. Det. Murphy knew "Big Dough" also was known as Deshawn Stewart, had arrested Big Dough previously, and knew he drove a 1989 blue Oldsmobile automobile. Moreover, after the CI informed the detectives that Big Dough was en route to make the transaction, they observed Big Dough's blue Oldsmobile leave the 4000 block of Grove; the location where the CI stated the narcotics sale would take place. Given the totality of these circumstances, it was lawful for the officers to follow and stop the vehicle to investigate the situation further.

It further was lawful for Det. Murphey to arrest the defendant. Upon approaching the vehicle, Det. Murphey observed the defendant lean forward, place his left hand behind his back, and then lean back. Det. Murphey had a reasonable suspicion defendant may possess a firearm, based on the CI's information, and the defendant's behavior. Det. Murphey was well within his right to order defendant to lean forward and place his elbows on the dashboard, and upon doing so, Det. Murphey immediately recognized the substance between defendant's back and the seat as marijuana. United States v. Shranklen, 315 F.3d 959, 961 (8th Cir.), cert. denied, 538 U.S. 971 (2003) ("[O]fficers may take steps reasonably necessary to protect their personal safety.").

An arrest warrant is not required when police officers have probable cause to arrest a suspect who is riding in an automobile on a public street. United States v. Czeck, 105 F.3d 1235, 1238 (8th Cir. 1997) ("[W]hen a suspect is in a car that is in a public place (and the suspect is thus at least partially visible to the public), an officer with probable cause may arrest the suspect without a warrant."). Probable cause to arrest without a warrant exists when the police have information sufficient to cause a reasonable person to believe that the defendant had committed an offense or was then committing an offense. Beck v. Ohio, 379 U.S. 89, 91 (1964); United States v. Sherrill, 27 F.3d 344, 347 (8th Cir.), cert. denied, 513 U.S. 1048 (1994); United States v. Williams, 897 F.2d 1430, 1435 (8th Cir. 1990). This determination does not depend on individual facts, but depends on the cumulative effect of the facts in the totality of the circumstances. United States v. Brown, 49 F.3d 1346, 1349 (8th Cir. 1995). Clearly, based on the totality of the circumstances, including the CI's information, the detective's observations, and recognition of the "green substance" as marijuana, Det. Murphey had probable cause to arrest defendant for possession of a controlled substance.

Accordingly, the vehicle stop and subsequent arrest were lawful and any evidence found therein should not be suppressed.

**B.   Residence Search**

The undersigned concludes that the detectives lawfully conducted a consent search of defendant's residence. A warrantless search is authorized by the voluntary consent of someone who has authority over the place to be searched. Schneckloth v. Bustamonte, 412 U.S. 218, 222-23 (1973); United States v. Armstrong, 16 F.3d 289, 295 (8th Cir. 1994); United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990). Whether consent was voluntarily given depends upon the totality of the circumstances. United States v. Heath, 58 F.3d 1271, 1276 (8th Cir.), cert. denied, 516 U.S. 892 (1995). Consent is voluntary if it is the product of an "essentially free and unconstrained choice by its maker." Bustamonte, 412 U.S. at 225; Armstrong, 16 F.3d at 295. The court must examine the environment in which consent was given, including how long the

individual was detained, and whether the individual 1) was threatened, physically intimidated, or punished by the police; 2) relied upon police's promises or misrepresentations; 3) was in custody or under arrest; 4) was in a public or a secluded place; and 5) objected to the search. United States v. Hathcock, 103 F.3d 715, 719-20 (8th Cir.), cert. denied, 521 U.S. 1127 (1997).

In the case at bar, defendant gave a knowing and voluntary consent to the search of his residence. Defendant was arrested and read his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Det. Murphey explained the Consent to Search form, and defendant signed the form acknowledging he had the right to refuse consent, he had the right to refuse to sign the consent form, and that no promises, threats, or instances of force or coercion were used against him to obtain consent for the search. Moreover, defendant expressed no hesitation at giving consent, and he was asked to give consent on a public roadway. The only factor present that may belie the voluntariness of defendant's consent is that he was under arrest at the time. Given the circumstances of this case, in toto, the fact that defendant was under arrest at the time of consent is not enough to conclude such consent was involuntary. See United States v. Watson, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to search."); Czeck, 105 F.3d at 1239 (finding the custodial status of the consenting party is not determinative of the voluntary nature of the consent, and that a signed consent form is the most important factor to consider).

Turning to the search itself, the undersigned concludes that the search was validly executed. Officers must conduct a search in a reasonable manner. Hummel-Jones v. Storpe, 25 F.3d 647, 651 (8th Cir. 1994). "Officers may seize an item if they have a lawful right of access to the item seized and the object's incriminating nature is immediately apparent." United States v. Nichols, 344 F.3d 793, 799 (8th Cir. 2003); see United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (items are immediately apparent if the officer has probable cause to associate it with criminal activity).

In this case, Det. Murphey placed defendant in a police cruiser and followed defendant to his residence. While inside, Det. Murphey asked

- 7 -

defendant where the firearm was located.  Defendant directed Det. Murphey to the location of the firearm, whereby Det. Murphey found a sawed-off shotgun in an open dresser drawer, and seized the item.  Thereafter, defendant was transported to the police station.  These facts and circumstances do not indicate that the detectives exceeded the scope of the consent or executed the search in an unlawful manner.

Therefore, the consent to search defendant's residence and the search itself was valid and any evidence derived thereof should not be suppressed.

**C.   Defendant's Statements**

Miranda v. Arizona requires a suspect be advised of his right to an attorney and to be free from self-incrimination prior to any custodial interrogation.  Miranda, 384 U.S. at 444.  After advising the suspect of his Miranda rights, the police may question a suspect who has made a voluntary, knowing, and intelligent waiver of his rights. Colorado v. Connelly, 479 U.S. 157, 169-70 (1986).

Defendant's statements (written and oral) made at the time of, and subsequent to, the vehicle stop and arrest for possession of a controlled substance, at the time of, and subsequent to, the search of his residence, and at the time of, and subsequent to, his transportation to the police station, are admissible and should not be suppressed.

Defendant was orally advised of, and stated that he understood, his Miranda rights immediately after his arrest for possessing controlled substances, and upon arrival at the police station.  Before providing a written statement, defendant was given a written Warning and Waiver form, which he read together with Det. Murphey, detailing his rights. Defendant initialed each statement, indicating he understood his rights and that he voluntarily waived such rights to make a statement.  There is no indication that he failed to understand his rights, that he lacked command of his faculties, or that he failed to recognize or appreciate the extent and importance of his actions and surroundings.  Furthermore, there is no evidence indicating that any officer intimidated, deceived, or coerced him into making a statement.  See Moran v. Burbine, 475 U.S. 412, 421-23 (1986); Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984).

Consequently, defendant was advised of his rights prior to making

both oral and written statements in accordance with <u>Miranda</u>, and such statements were in conformity with a knowing, intelligent, and voluntary waiver of those rights. Defendant's statements are admissible.

Whereupon,

**IT IS HEREBY RECOMMENDED** that the motion of defendant to suppress evidence and statements (Doc. 12) be denied.

The parties are advised they have ten (10) days to file written objections to this Report and Recommendation. The failure to file objections may result in a waiver of the right to appeal issues of fact.

/s/ David D. Noce

**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed this day, January 11, 2005.